Lacy THOMAS, Plaintiff–Counterclaim
Defendant–Appellant,

and

Colette Thomas and Percy Giles,
Counterclaim–Defendants–
Appellants,

v.

UNITED STATES of America,
Defendant–Counterclaim
Plaintiff–Appellee.

Nos. 93–3186, 93–3483 and 93–3484 *.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1994.

Decided Nov. 22, 1994.

---

* After cause number 93–3484 was set for oral argument, the parties agreed to submit the case for decision on the briefs pursuant to Federal Rule of Appellant Procedure 34(f).

Lewis Myers, Jr., Chicago, IL, Walter Jones, Jr. (argued), Jorge V. Cazares, Stephen H. Pugh, Pugh, Jones & Johnson, Chi-

cago, IL, Linnae Wise Bryant, Brown, Bryant & Porter, Chicago, IL, Cheryl Bonds Rayner, A.A. Rayner & Son Funeral Home, Chicago, IL, for Lacy Thomas.

Gary R. Allen, Kenneth L. Greene, Teresa McLaughlin, Scott P. Towers, Pamela ·C. Berry (argued), Dept. of Justice, Tax Div., Appellate Section, Washington, DC, John S. Brennan, Asst. U.S. Atty., Office of the U.S. Atty., Civ. Div., Appellate Section, Chicago, IL, Eugene J. Rossi, Dept. of Justice, Tax Div., Senior Trial Atty., Washington, DC, for U.S.

Bruce C. Spitzer, Philip B. Bowman, Jennifer A. Lazewski (argued), Gorham, Metge, Bowman & Hourigan, Chicago, IL, for Colette Thomas.

James D. Holzhauer, Tyrone C. Fahner, Lori E. Lightfoot, Mayer, Brown & Platt, Chicago, IL, for Percy Giles.

Before WELLFORD,** MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Lacy Thomas and Colette Thomas, who are not related to one another, each worked during different periods as the Assistant Vice–President and Controller for the Mile Square Health Center ("Mile Square"), a not-for-profit westside Chicago community health clinic. Percy Giles, an Alderman for the 37th Ward of the City of Chicago, served on Mile Square's Board of Directors, as Mile Square's Treasurer, and as Chairman of the Finance and Planning Committee. Albert Morris was the Chairman of the Board of Mile Square. F. Daniel Cantrell was the President and Chief Executive Officer of Mile Square.

In the 1980's Mile Square faced hard financial circumstances brought on by the loss of a substantial federal block grant in 1985 and by perennially late Medicare and Medicaid reimbursements from the State of Illinois. In the face of its money crunch, Mile Square failed to pay the government taxes that it had withheld from the wages of its employees during the last two quarters of 1987, the first three quarters of 1988, and the fourth

quarter of 1989. The Internal Revenue Service assessed one hundred percent penalties against Mr. Thomas,· Ms. Thomas, Giles, Cantrell, and Morris under the authority of 26 U.S.C. § 6672. The penalties were in the following amounts: (1) $215,373.50 against Mr. Thomas for the third quarter of 1987; (2) $806,107.20 each against Ms. Thomas, Giles, Cantrell, and Morris for the third and fourth quarters of 1987, the first, second, and third quarters of 1988, and the fourth quarter of 1989.

Mr. Thomas paid part of the assessment and then filed suit seeking a refund of the amount he paid. The government counterclaimed against Mr. Thomas for the balance of the assessment and filed cross claims against Ms. Thomas, Giles, Cantrell, and Morris for the full amount of their assessments. As the litigation progressed, the government dropped its assessment against Ms. Thomas for the third quarter of 1987 and the fourth quarter of 1989, reducing Ms. Thomas' maximum liability to $463,441.98. The government also abated assessments against Giles, Cantrell, and Morris for the fourth quarter of 1989, reducing each of their maximum liabilities to $781,688.44. Just prior to trial, Cantrell settled with the government and agreed to the entry of judgment against him. At the close of the trial of Mr. Thomas, Ms. Thomas, Giles, and Morris, each party moved for judgment as matter of law (formerly called a motion for directed verdict, see FED.R.CIV.P. 50). The district court denied the motions. The jury returned verdicts in favor of Morris but against Mr. Thomas, Ms. Thomas, and Giles in the full amounts of their assessments. Following the return of the verdicts, Mr. Thomas, Ms. Thomas, and Giles each moved for judgment after trial (formerly called a motion for judgment notwithstanding the verdict and sometimes also called judgment as a matter of law) pursuant to FED.R.CIV.P. 50(b), or alternatively for a new trial under FED.R.CIV.P. 59(a). The district court denied these motions as well.

On appeal, Mr. Thomas, Ms. Thomas, and Giles each challenge the district court's denial of their motions for judgment as a matter

** The Honorable Harry W. Wellford, of the Sixth Circuit, sitting by designation.

of law and of their motions for judgment after trial. Specifically, they claim that the district court should have found as a matter of law that each of them was not a responsible person and was therefore not required to pay Mile Square's withholding trust fund taxes. They also claim that the district court should have found as a matter of law that, even if each were a responsible party, none possessed the willfulness needed to be liable for nonpayment of the withholding trust fund taxes. Mr. Thomas raises three additional issues for review: (1) whether the district court erred in refusing to modify Jury Instructions Nos. 8 and 13 (defining responsible person and willfulness, respectively) and in refusing Lacy Thomas Jury Instructions Nos. 4, 6, and 8 (each outlining various theories for finding Mr. Thomas not liable); (2) whether the court committed reversible error in refusing to admit Lacy Thomas Exhibit No. 5 (an IRS form); and (3) whether the district court should have granted him a new trial because the verdict was against the weight of the evidence.

## I. Denied Motions for Judgment as a Matter of Law

■ Mr. Thomas, Ms. Thomas, and Giles all raise the issue of whether the district court erred in refusing to find that they were neither responsible nor willful as a matter of law with regard to section 6672 of the Internal Revenue Code (26 U.S.C. § 6672). Because they involve only questions of law, we review motions for judgment as a matter of law *de novo*. *Bowlen v. United States,* 956 F.2d 723, 727 (7th Cir.1992); *see Tapia v. City of Greenwood,* 965 F.2d 336, 338 (7th Cir.1992). We will reverse the district court's denial of the motions for judgment as a matter of law and motions for judgment after trial only if we conclude that a reasonable juror could not have found appellants responsible or willful based on the evidence admitted at trial viewed in the light most favorable to the government. *Bowlen,* 956 F.2d at 727; *Tapia,* 965 F.2d at 338.

■ The Internal Revenue Code of 1986 requires employers to withhold federal Social Security and income taxes from the wages of their employees and to hold those taxes in trust for the government. 26 U.S.C. §§ 3102, 3402. Employers must report and pay the taxes they withhold quarterly. Congress enacted section 6672(a) of the Code to protect against employers' squandering this trust fund. Section 6672(a) provides that "Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax" shall be subject to a one hundred percent penalty equal to the total amount of the unpaid taxes. 26 U.S.C. § 6672(a). The Supreme Court has interpreted this statute to impose liability on any person who fails to perform his duty to collect, account for, or pay over the withholding taxes. *Slodov v. United States,* 436 U.S. 238, 247, 250, 98 S.Ct. 1778, 1785, 1787, 56 L.Ed.2d 251 (1978).

■ A person must be both "responsible" and "wilful" to be liable for an employer's failure to collect or pay over trust fund taxes to the United States. *Bowlen,* 956 F.2d at 727. Once the government has assessed a taxpayer for the nonpayment of taxes under section 6672, the taxpayer bears the burdens of production and persuasion to disprove his status as a responsible person who willfully failed to collect, account for, or pay over the taxes. *Ruth v. United States,* 823 F.2d 1091 (7th Cir.1987).

■ A taxpayer can be held liable as a responsible person under section 6672 in this circuit "if he retains sufficient control of corporate finances that he can allocate corporate funds to pay the corporation's other debts in preference to the corporation's withholding tax obligations." *Bowlen,* 956 F.2d at 728. Having significant control does not mean having exclusive control over the disbursal of funds or the final say over whether taxes or bills are paid. *Id.* More than one taxpayer can be a responsible person in a given instance. *Id.* The concept of responsibility in this context does not focus on whether a particular taxpayer could himself have paid the taxes; rather, it focuses on whether the taxpayer could have impeded the flow of business to the extent necessary to prevent the corporation from squandering the taxes it withheld from its employees. *See id.* (noting that "responsibility under section 6672 en-

compasses all those connected closely enough with the business to prevent the default from occurring."). Indicia of a responsible person include possessing checkwriting authority (and the converse authority to refuse to write checks), *id.*, and holding a corporate office, *see Monday v. United States*, 421 F.2d 1210, 1214–15 (7th Cir.1970), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970) (noting that holding corporate office does not *per se* impose a duty, but that an officer may have such a duty even if he is not the disbursing officer so long as he otherwise has sufficient power within the corporate structure).

 "Willful," as the term is used in section 6672, means "voluntary, conscious and intentional—as opposed to accidental—decisions not to remit funds properly withheld to the government." *Monday*, 421 F.2d at 1216 (citations omitted). Furthermore, willful in this civil context does not mean possessing a specific fraudulent intent or evil motive. *Id.; Domanus v. United States*, 961 F.2d 1323, 1326 (7th Cir.1992). A responsible person willfully fails to remit withheld taxes to the government if he pays other creditors after he knows of the employer's failure to pay the withheld funds to the government. *Garsky v. United States*, 600 F.2d 86, 91 (7th Cir.1979). Indeed, a responsible person satisfies the willful standard if he recklessly disregards a known risk that the trust funds may not be paid to the government. *Id.*

### Lacy Thomas and Colette Thomas

 The government produced evidence at trial to show that Mr. Thomas and Ms. Thomas each served as Mile Square's Assistant Vice–President and Controller (though Ms. Thomas followed Mr. Thomas and was only the *acting* Vice–President and Controller). In those roles they supervised Mile Square's accounting, finance, and payroll activities. They prepared and issued the payroll, prepared and filed employment tax returns, and prepared monthly financial reports for the Mile Square Board of Directors. They had the authority to sign checks for less than $1,000, to co-sign checks above $1,000, to determine whether and when bills for under $1,000 would be paid, to prioritize

the payment of bills exceeding $1,000, and to hire and fire personnel within their chains of command (though Mr. Cantrell may have had at least perfunctory approval power over hirings and firings). Each admits knowing that, during the periods for which they were assessed (the third quarter of 1987 for Mr. Thomas and the first three quarters of 1988 for Ms. Thomas), Mile Square was failing to pay its withholding taxes. Despite this knowledge, they allowed Mile Square to meet its payroll, signed checks in amounts up to $1,000, and co-signed checks exceeding $1,000.

These facts provide the basis for a reasonable person to conclude that both Mr. Thomas and Ms. Thomas could have impeded the functioning of Mile Square by refusing to sign and co-sign checks and by refusing to allow payroll to go forward until Mile Square paid the government the taxes it had withheld from the wages of its employees. Accordingly, these facts support the conclusion that Mr. Thomas and Ms. Thomas were responsible persons within the meaning of section 6672. They also substantiate a finding that Mr. Thomas and Ms. Thomas acted willfully: each knew of Mile Square's failure to pay over the withheld taxes, yet each paid other creditors anyway.

 Mr. Thomas and Ms. Thomas hang their hats on the argument that section 6672 should not require taxpayers who might otherwise be responsible persons to disobey direct orders from their superiors not to pay the withheld taxes to the government. They direct us to *Graunke v. United States*, 711 F.Supp. 388 (N.D.Ill.1989) for the argument that section 6672 does not require responsible persons to disobey direct orders of superiors in order to avoid liability. Indeed, they argue that F. Daniel Cantrell, the president and CEO of Mile Square and Mr. Thomas' and Ms. Thomas' immediate superior, made the final decisions regarding which creditors to pay. Mr. Thomas argued that he discussed with Cantrell the importance of paying the taxes, prepared checks for Cantrell's signature, and gave first priority to the taxes (Mr. Thomas alone did not have the authority to pay the taxes), but Cantrell then refused to sign the checks as the taxes became due.

Ms. Thomas argued that she felt she had very little power to influence the payment of the taxes. She succeeded Mr. Thomas, but felt she had little job security because she was only the Acting Controller. Also, Cantrell had forbidden her to talk to the members of Mile Square's Board. Both Mr. Thomas and Ms. Thomas recognized that Cantrell would veto any attempt to pay the taxes that Mile Square owed the government. Mr. Thomas eventually quit after the third quarter of 1987 as a result of Cantrell's recalcitrance; Ms. Thomas feared she would lose her job if she tried to contravene Cantrell's authority. These facts demonstrate that section 6672 is a tough statute, but they do not absolve either Mr. Thomas or Ms. Thomas of liability.

*Graunke* involved a taxpayer (Graunke) who worked at the Heritage Cabinet company under Heritage's sole stockholder, Curcio. *Id.* Both Graunke and Curcio had checkwriting authority. *Id.* When Heritage failed to pay its withholding taxes, the government assessed a penalty against Graunke, who argued that he had limited authority and that Curcio made all financial and employment decisions, including which creditors to pay. *Id.* Graunke paid only the bills Curcio directed him to pay. *Id.* The district court held that Graunke was not a responsible person as a matter of law, concluding that "it does not appear that the law has gone so far as to require that a person must disregard checkwriting instructions in order to avoid liability." *Id.* at 394.

The district court in *Graunke* based its decision on a case from the Tenth Circuit, *Jay v. United States*, 865 F.2d 1175 (10th Cir.1989). *Jay* involved a taxpayer who worked as a bookkeeper for a company that did not pay its withholding taxes. *Id.* at 1176. The taxpayer, Jay, "was aware of policy decisions by the corporation's executives, signed corporate checks and paid bills to creditors from the corporation's bank account, which included funds withheld from employees' wages." *Id.* But Jay acted according to the instructions from his boss,

Helmuth, as to which major bills to pay. *Id.* Helmuth testified that he decided whether to prefer other creditors to the United States. *Id.* at 1177. At trial, the government moved for, and the district court granted, summary judgment against Jay. *Id.* at 1176. On appeal Jay defended himself on the ground that he was not a responsible person. *Id.* at 1177. The Tenth Circuit reversed, concluding that "This is not a case where the taxpayer necessarily possessed authority to pay all bills ...; nor did Jay receive generalized instructions on priorities.... Here, the president and general manager of the corporation specifically told Jay to pay other creditors, not the United States." *Id.* at 1179 (citations omitted). Most notably for our purposes, however, the court refused to find as a matter of law that Jay was *not* liable: "We do not hold that Jay is absolved of liability." *Id.* The Tenth Circuit remanded the case for a trial on the merits so that a jury could decide whether Jay was a responsible person under section 6672.

*Jay* stands for the proposition that signing checks only at the direction of one's superior does not alone make one a responsible person for purposes of section 6672. *See id.* Appellants essentially argue that we should not only adopt *Jay* as the law in this circuit, but that we should also extend its holding, through *Graunke*, to preclude liability where the taxpayer shows that he took direction from a superior in writing checks to creditors in preference to the government. This we decline to do. As we are not reviewing a summary disposition in the government's favor, we do not have occasion to pass on *Jay*'s validity in this circuit. Moreover, *Graunke* is unpersuasive to the extent it applies the holding of *Jay* to preclude the liability of those who show that a superior limited their checkwriting authority.[1] These are facts that the appropriate trier must sift and weigh. In this case, the jury heard testimony regarding Mr. Thomas' and Ms. Thomas' helpless, subservient roles in Mile Square and still found that they were responsible

---

1. It is not clear that this is the only basis on which the *Graunke* court found for the taxpayer as a matter of law. The court also discussed other facts that contributed to its decision, such

as Graunke's physical removal from the locus of decision making and lack of involvement in the day-to-day activities of the corporation. *See Graunke*, 711 F.Supp. at 394.

and willful. There was plenty of evidence for the jury reasonably to reach this verdict; each appellant prepared and issued Mile Square's payroll, supervised finance and accounting, prepared and filed employment tax returns, possessed the power to sign checks alone for less than $1,000 and to co-sign checks for over $1,000, prioritized the payment of bills in excess of $1,000 and was principally responsible for paying vendors.

It is true that Lacy Thomas eventually quit Mile Square when he realized he could not prevent Mile Square from defaulting on its tax obligations. He departed, however, only after he had seen on a weekly basis for three months that Cantrell would not pay the withholding taxes. He simply waited too long to quit to shield himself from liability as a matter of law. Had he quit immediately upon learning of Cantrell's recalcitrance, or even shortly thereafter, we might find differently. According to the facts before us, however, the district court did not err in refusing to grant Mr. Thomas' and Ms. Thomas' motions for judgment as a matter of law or judgment after trial.

### Percy Giles

 As the volunteer Treasurer of Mile Square, Percy Giles was *ex officio* Chairman of the Mile Square Finance and Planning Committee. He also could co-sign large checks. He had the opportunity to attend meetings where corporation officers discussed Mile Square's tough financial straits and presented committee members with packets of information detailing Mile Square's receipts and expenditures. Percy Giles was a busy man during the third and fourth quarters of 1987 and the first three quarters of 1988. He was elected Alderman of Chicago's 37th Ward in a March 1986 special election and had to run again for his seat in February 1988. As Alderman, Giles worked about twelve hours per day. And as a consequence of his busy schedule, Giles was not able to attend many Board meetings. Moreover, when he ran finance committee meetings, Giles merely followed an agenda that Cantrell had prepared for him. Giles claims that he did not know about Mile Square's failure to pay withholding taxes be-

cause he did not have time to review finance reports prepared for the committee. In fact, Mr. Giles was so busy as Alderman he claims he did not even notice that Mile Square's payroll checks bore his signature.

Giles argues that he did not have much real authority as Treasurer and Finance Committee Chair of Mile Square. He attempted at trial to impress upon the jury that, although he had limited check-signing authority, he never used that authority to the extent necessary to make him a responsible and willful taxpayer. But the jury was not impressed, and neither are we.

Like Ms. Thomas and Mr. Thomas, Giles may not seek refuge from liability as a matter of law under the tent of Cantrell's authority. Giles signed enough checks to convince the jury that he was both responsible and willful. He also had the authority, though he may not have exercised it, to direct the Finance Committee toward solving Mile Square's tax problems. And he accompanied Cantrell to a bank to get financing for Mile Square. His claims that he did not read the financial reports that Cantrell and others prepared for the Board or know that Mile Square's payroll checks bore his signature do not diminish Giles' liability.

We have ruled that a " 'responsible person' is liable if he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out very easily." *Wright v. United States*, 809 F.2d 425, 427 (7th Cir.1987). The jury in this case reasonably concluded that, even if Giles did not know about Mile Square's failure to pay withholding taxes, he clearly should have known because he was Treasurer and Finance Chairman and because he could have learned very easily by reviewing the finance reports Cantrell and others prepared for him. Giles' claimed ignorance regarding his signature on payroll checks does not indicate his lack of responsibility; rather, it highlights a lack of reasonable diligence with respect to his duties at Mile Square. The jury reasonably found this lack of diligence inexcusable in the face of Mile Square's obligations to the government. The district court did not err in refusing to grant Percy Giles' motions for

judgment as a matter of law or judgment after trial.

## II. Lacy Thomas' Additional Claims

Lacy Thomas also claims that the district court erred in refusing to instruct the jury as he desired, in refusing to admit into evidence a tax form he proffered, and in refusing to grant his Rule 59 motion for a new trial.

### *Jury Instructions*

When reviewing jury instructions, "we must look to the instructions as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well." *Wilk v. American Medical Ass'n,* 719 F.2d 207, 219 (7th Cir.1983), *cert. denied,* 467 U.S. 1210, 104 S.Ct. 2398, 2399, 81 L.Ed.2d 355 (1984). One or more flawed instructions will not persuade us to order a new trial unless the flaws seriously affected the jury's understanding of the issues to the prejudice of Mr. Thomas. *Id.*

Mr. Thomas argues that the district court erred in refusing to modify Jury Instructions Nos. 8 and 13 to his liking. Instruction No. 8 defines the term "responsible person" broadly, as "not limited to the person who actually prepares the payroll checks or the tax returns." Mr. Thomas complains that this language improperly focused the jury on preparing payroll checks and tax returns as meaningful factors which indicate liability. He argues that the language suggests that preparing payroll checks and tax returns constitutes enough responsible activity to create liability and that such a suggestion is an incorrect statement of the law. Mr. Thomas objects to Jury Instruction No. 13 because it describes some factors indicating willfulness but does not describe others more favorable to Mr. Thomas.

Any flaw in the implication of Instruction No. 8 that one who does nothing more than prepare payroll checks and tax returns can be liable is cured by a broad view of the instructions. Instruction No. 10, for example, states that signing checks and completing tax forms are by themselves insufficient to create liability. Because *preparing* payroll checks logically constitutes a less significant step toward responsibility than *signing* the checks, Instruction No. 10 effectively rectifies any subtly inaccurate statements of Instruction No. 8.

Furthermore, the context of the instruction indicates that the district court was actually directing the jury's attention away from payroll check signing authority and tax preparation authority and toward larger conceptions of responsibility. The sentence preceding the contested language speaks of the power to pay taxes, the power to make financial decisions, and the power to determine which creditors are to be paid. The sentence following it refers to liability based on "significant power to decide who will receive corporate funds." The court wanted the jury to focus on whether Mr. Thomas had significant control over corporate funds, apart from any ability to prepare checks or tax returns. Accordingly, we find to be without merit Mr. Thomas' argument that the district court's refusal to modify Jury Instruction No. 8 constitutes error.

Jury Instruction No. 13 defines willfulness as recklessness, stating that the defendant should be found willful if "he (1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." Mere negligence, the instruction informs, is not enough. Mr. Thomas argues that the instruction ought to have included other factors in describing willfulness, such as voluntariness, consciousness, intent, good faith, and whether another person strictly controlled the payment of taxes. On this point Mr. Thomas was remiss in not examining Instruction No. 8 beyond its discussion of responsibility. Instruction No. 8 also describes willfulness, using the very terms Mr. Thomas desires: voluntariness, consciousness, and intent. As such, it satisfies any need for those terms to be used in defining willfulness for the jury. Furthermore, Instruction No. 8 instructs the jury that good faith does not transform one's otherwise willful posture into inadvertence. It is inconsistent for Mr. Thomas to decline to object to this portion of Jury Instruction No. 8 when

he argues that the district court should have added a good faith excuse to Instruction No. 13 and should have accepted Lacy Thomas Instruction No. 8 (asserting that Mr. Thomas' good faith excused him from liability). Whatever the reason for Mr. Thomas' inconsistency, the district court properly instructed the jury that good faith is not an excuse which negates willfulness. *See Domanus*, 961 F.2d at 1326. And the court properly refused to insert any language to the contrary in Jury Instruction No. 13 and to accept Lacy Thomas Instruction No. 8.

 The district court also properly refused to instruct the jury that another person's strictly controlled authority to pay other creditors might negate Mr. Thomas' liability. The court instructed the jury how to treat concomitant responsibility and willfulness in Jury Instruction No. 11, which reasonably conveys the law that more than one person may be liable and that persons with varying degrees of culpability may all be liable under section 6672. It was reasonable for the district judge to refuse to instruct the jury that Mr. Cantrell's heavy hand could shield Mr. Thomas from liability.

 Mr. Thomas again raises this argument when he insists that the jury should have been instructed (via Lacy Thomas Instruction No. 4) that if they found that Cantrell "made all significant financial decisions and controlled the payment to creditors" they would also have to find Mr. Thomas not liable. This assertion reveals Mr. Thomas' attempt to avoid the scope of existing law. One person's liability does not negate the liability of others. *Bowlen*, 956 F.2d at 727. Mr. Thomas attempts to rely on *Jay* and *Graunke* to establish exactly the opposite proposition. As discussed earlier in this opinion, however, we reject the argument that those cases shield anyone's underlings from liability as a matter of law. Mr. Thomas attempts to stretch the reasonable, though inaccurate, proposition that section 6672 does not require one to disobey superiors into the assertion that, if those superiors are liable, the underlings cannot be liable. This assertion, of course, contradicts the established authority of this circuit.

 The district court also refused to accept Lacy Thomas Instruction No. 6, which states:

It is Lacy Thomas' theory of defense that he is not a responsible party because he did not have significant control over the finances of Mile Square Health Center and did not have the authority to determine which creditors would be paid. It is also Lacy Thomas' defense theory that he was not required to disregard the president's checkwriting instructions.

The district court did not err in refusing the final sentence of this instruction; the instruction does not present a viable theory of defense. The remainder of the instruction, while presenting a viable defense theory, merely reiterates Instruction No. 8: Lacy Thomas' liability depends upon whether he had significant control of the finances of Mile Square and the authority to determine which Mile Square creditors would be paid. The district court's refusal to accept Lacy Thomas Instruction No. 6 was reasonable and proper.

### Exclusion of Lacy Thomas Exhibit No. 5

 Lacy Thomas left Mile Square after the third quarter of 1987. At trial he testified that he left for three reasons: he felt he could no longer influence Cantrell, he felt Mile Square was drifting along an irreversible course toward financial ruin, and he felt he could do nothing to help Mile Square financially. During cross examination, the government asked several times whether Mr. Thomas quit because he was afraid of incurring liability for Mile Square's unpaid taxes. Rather than straightforwardly rejecting this suggestion, Mr. Thomas repeatedly referred the government to the three reasons listed above. During its closing, the government argued that all of the evidence demonstrated that Lacy Thomas had been less than candid about his reasons for leaving Mile Square and that one of the reasons he left was that he was afraid of the tax liability. The government based its argument on the testimony of Fred Ross, Mile Square's Director of Legal Affairs from 1973 until 1988. Ross testified that Mr. Thomas expressed his fear about liability for the unpaid taxes in July or

August of 1987. (Mr. Thomas left Mile Square at the end of September 1987.)

Based on the government's questions of Mr. Thomas about his reasons for leaving Mile Square, Mr. Thomas proffered IRS form 4180, dated June 26, 1990. The form included a statement by Lacy Thomas that described his reasons for leaving Mile Square, including Mile Square's declining financial position and other employment opportunities available to Mr. Thomas. The district court refused to admit the document, concluding that it constituted inadmissible hearsay. Mr. Thomas argued that it was admissible under FED.R.EVID. 801(d)(1)(B) because the declarant (Mr. Thomas) was available for cross examination regarding the statement, the statement was consistent with his testimony at trial, and Mr. Thomas was offering it to rebut an implied charge of recent fabrication. The district court rejected the notion that there had been a charge, express or implied, of recent fabrication against Mr. Thomas.

■ We will order a new trial based on erroneously excluded evidence only if we determine that the district court abused its discretion in excluding the evidence and that such error prejudiced substantial rights of the appellant. *Taylor v. National R.R. Passenger Corp.*, 920 F.2d 1372 (7th Cir.1990); *see* 28 U.S.C. § 2111; FED.R.CIV.P. 61; FED. R.EVID. 103.

■ Hearsay, as Rule 801 defines it, includes statements, other than those offered by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Hearsay generally is not admissible. FED.R.EVID. 801(c), 802. However, Rule 801 also states that various prior statements of declarants who are present at the trial or hearing and who are subject to cross examination are not hearsay, including statements consistent with declarant's testimony that are offered to rebut an express or implied charge of recent fabrication. FED.R.EVID. 801(d)(1)(B). In order to meet this latter requirement, the examining party must charge, either implicitly or explicitly, that the declarant recently fabricated his testimony, and the declarant must have made the proffered statement before the motive to fabricate arose. *United States v. Patterson*, 23 F.3d 1239, 1247 (7th Cir.1994).[2]

■ The government argues that it did not charge that Lacy Thomas had recently fabricated his reasons for leaving Mile Square. Instead, the government argues that its questions regarding his reasons for leaving were designed to question his credibility as a witness. The district court agreed with the government and excluded Lacy Thomas Exhibit No. 5 specifically because it found that the government had made no charge of recent fabrication. The issue is the extent to which questions which impeach a witness for lack of credibility also imply a charge of recent fabrication. If these two notions are coextensive, the district court may have erred in excluding Lacy Thomas Exhibit No. 5. We hold, however, that they are not coextensive. Rather, a charge of recent fabrication is a narrow subset of impeachment for credibility. One may impeach for lack of credibility without going so far as to charge recent fabrication. As we noted in *Christmas v. Sanders*, 759 F.2d 1284, 1288 (7th Cir.1985), "[i]mpeachment on cross-examination is designed to attack the credibili-

---

2. This final requirement, that, to be admissible under FED.R.EVID. 801(d)(1)(B), the prior consistent statement must have been made before the motive to fabricate arose, is also law in the Second Circuit. *United States v. Quinto*, 582 F.2d 224, 234 (2d Cir.1978). However, it is not a proposition that is universally accepted. *See United States v. Tome*, 3 F.3d 342, 350 (10th Cir.1993), *cert. granted in part, Tome v. United States*, —— U.S. ——, 114 S.Ct. 1048, 127 L.Ed.2d 370 (1994); *United States v. Montague*, 958 F.2d 1094, 1098 (D.C.Cir.1992); *United States v. Pendas–Martinez*, 845 F.2d 938, 942 n. 6 (11th Cir.1988); *United States v. Parry*, 649 F.2d

292, 296 (5th Cir. Unit B, June 1981). In fact, the split comes into focus during this term of the U.S. Supreme Court. The Court may resolve this issue in *Tome v. United States*, No. 93–6892, an appeal from the Tenth Circuit's rejection of the pre-motive standard.

With respect to the case before us, Mr. Thomas does not argue that he offered his prior consistent statement merely to rehabilitate his testimony on the stand, that is, not as substantive evidence. Therefore, we will not address whether FED.R.EVID. 801(d)(1)(B) would encompass the admissibility of his prior statement offered for that purpose.

**1120**

ty of the witness, and often it can be construed as a charge that the witness is a liar as well as a charge that the witness is making up a *new* story." (Emphasis added.) We will not find abuse of discretion where, as here, the impeachment is susceptible of either interpretation. *Id.* The district court quite reasonably concluded that the government was only impeaching Thomas in that they were not charging that he fabricated the reasons he gave for leaving. Rather, the line of questioning was intended to show that Thomas was not telling the whole story, that an additional reason for his leaving was his fear that he would be liable for the unpaid taxes.

Furthermore, in this circuit the witness must have made the prior consistent statement before the motive to fabricate arose; otherwise, the statement is nothing more than cumulative evidence and does not logically disprove the cross-examiner's charge. *See United States v. Harris,* 761 F.2d 394, 399 (7th Cir.1985). In this case Lacy Thomas' motive to fabricate arose as soon as the government assessed him for Mile Square's unpaid payroll taxes on June 9, 1990. Therefore, his statement regarding his reasons for leaving Mile Square, which he made on June 26, 1990, possesses no qualitative difference from his consistent statements on the stand. There was no intervening motive which Thomas' prior statement would have rebutted. The district court did not abuse its discretion in excluding Lacy Thomas Exhibit No. 5.

**III. Whether the Jury's Verdict Against Lacy Thomas Was Against the Weight of the Evidence**

Finally, Mr. Thomas argues that the district court erred in refusing his Rule 59(a) motion for a new trial. A district court judge "is permitted to grant such a motion where the jury's verdict [is] against the weight of the evidence." *Sokol Crystal Prods., Inc. v. DSC Comms. Corp.,* 15 F.3d 1427, 1432 (7th Cir.1994). We review the district judge's ruling for abuse of discretion. *Id.* "In reviewing a motion for a new trial, we view the evidence in the light most favorable to the prevailing party. We will not set aside the jury's verdict if there is a reasonable basis in the record which supports that verdict." *Allison v. Ticor Title Ins. Co.,* 979 F.2d 1187, 1196 (7th Cir.1992) (citations omitted).

The district court did not abuse its discretion in refusing Lacy Thomas' motion for a new trial. The record reveals that the government proffered plenty of evidence upon which the jury reasonably could base its verdict in favor of the government; Lacy Thomas' evidence to the contrary does not outweigh the jury's conclusion. As recited earlier in this opinion, evidence showed that Lacy Thomas had checkwriting authority to the extent that he could decide whether to pay bills for less than $1,000. In fact, he was primarily responsible for paying vendors. He could also co-sign or refuse to co-sign some checks greater than $1,000 as well as prioritize the payment of bills in excess of $1,000. And he could have prevented Mile Square from meeting its payroll, though he could not sign payroll checks himself. Furthermore, Mr. Thomas admitted he knew at the time he wrote checks to other creditors that Mile Square had not paid its taxes to the government. From this evidence a reasonable juror could find that Lacy Thomas was both responsible and willful.

To counter this evidence, Mr. Thomas argues that he did not have the authority to pay the taxes and that he tried to persuade Mr. Cantrell to pay the taxes, going so far as to prepare the checks payable to the government and eventually quitting Mile Square when Cantrell refused to sign them. He also tried to show that he was a mere minion subject to the overpowering will of Mr. Cantrell.

First, whether or not Mr. Thomas could pay the taxes is not dispositive regarding his responsibility. Second, though his efforts to persuade Cantrell to pay the taxes may be laudable, they do not negate Mr. Thomas' culpability in paying other creditors. Finally, the evidence that Cantrell had complete control over the finances of Mile Square, while relevant and persuasive, is not so great as to prove that Lacy Thomas was not also responsible. The jury had the prerogative and the basis to decide either way regarding

Mr. Thomas' responsibility. We will not go back now and question their credibility determinations and apportionment of prevailing weight where sufficient evidence exists to support their conclusions.

For the foregoing reasons, the jury verdicts in favor of the government and against Lacy Thomas, Colette Thomas, and Percy Giles are AFFIRMED.